# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES,

       *Plaintiff,*

  vs.                             Case No. 22-10093-EFM

STEPHEN R. JAMES, JR.

       *Defendant.*

## MEMORANDUM AND ORDER

The Indictment charges Defendant Stephen R. James, Jr. with one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The Defendant has moved to suppress the results of the pat-down search in which the firearm was revealed, contending that the search followed an unlawful stop for an alleged violation of K.S.A. 8-133. (Doc. 16). The Court conducted an evidentiary hearing on Defendant's motion on August 7, 2023, and for the reasons set forth in the present Order, hereby denies the Motion to Suppress.

## I.      Factual and Procedural Background

Officers Jared Henry and Chris Hornberger are members of the WPD's Violent Crime Community Response Team, a group of officers focusing on violent crime and narcotics. Formerly known as the Gang Unit, the team specializes in following up on violent crime situations.

In early April of 2022, Officer Henry obtained a search warrant for the house at 1026 S. Fern Street in Wichita.  The warrant was based on both information about activity in the house and the results of prior stops of vehicles leaving the residence.  Defendant and another person, Kendra Davis, were present at the time.  Following the procedures of the Special Weapons and Tactics Team executing the warrant, the residents were first called upon to leave the house. When the officers then conducted the search, they recovered a firearm and drug paraphernalia.

Some three weeks later, at around 11:00 a.m. on May 3, 2022, Officers Henry and Hornberger were on routine patrol.  Henry was driving and Hornberger was in the passenger seat.  As a part of such patrols, the officers drive by numerous "problem houses" associated with violent activity, checking for suspicious activity or unknown vehicles.  One of those problem houses was the residence at 1026 S. Fern Street.  During the period after the execution of the search warrant, the officers had received an anonymous citizen complaint that there was frequent "in and out" activity at the house, with people coming and leaving, and that gunfire had been heard near the house.

Henry believed that Stephen James and his son Donnell lived at the residence.  The officers knew there was an arrest warrant for Donnell had been issued in Tulsa, Oklahoma.

As he drove by the house on Fern, Officer Henry saw a blue Audi A8 parked in the driveway.  He tried to read the tag in order to check its registration, but was unable to do so.  The tag appeared be a white paper temporary permit.

Officer Henry was about 100 feet away as he drove by, and he testified he can generally read paper tags at that distance.  He thought that condensation may have blurred the numbers.  In enforcing Kansas law, Henry uses 50 feet as his benchmark for the point at which a license must be visible, as he believes this is a normal safe distance for city streets.

Officer Henry drove past the house and entered an alley to the west. He left the patrol and walked to where he could watch the Audi. By the time he got in position, however, the Audi was backing out of the driveway. Officer Henry had not seen anyone get into the car. He hurried to rejoin Hornberger in the patrol car.

The officers attempted to follow the Audi, which had turned east on McCormick Street and was stopped at the intersection of that street with Seneca Avenue. The officers did not pull up behind the Audi, but alongside, trying to see if the driver was Donnell. The Audi then turned left to drive north on Seneca, and Officer Henry was unable to identify the driver, other than to see that he appeared to be shorter than the six-foot Donnell.

The officers drove through the intersection, performed a U-turn, and turned north to follow the Audi, which had then just turned right onto the merge ramp for the Kellogg expressway. Officer Henry closed with the Audi as it approached the Central Business District of Wichita, and, after another vehicle moved out of the way, he verified he could not read the Audi's tag as he was right behind it. He decided to stop the vehicle for the tag violation.

When Officer Henry activated his vehicle's lights, the Audi pulled to a stop on Kellogg Drive, the frontage road for the expressway.

The patrol car was then parked behind the Audi, and Officer Henry was still unable to read the tag. Officer Hornberger notified dispatch of the stop and their location.

Officer Henry then approached the Audi on the left and Officer Hornberger on the right. Henry asked the driver to roll down the window, and Officer Hornberger said "he's leaning to the right," indicating that he saw some kind of furtive movement. After Defendant rolled down the window, Officer Henry recognized him as Defendant James, and said "Just your tag is hard to read, man," and asked to see his drivers license.

- 3 -

When Defendant said "I just got the car," and turned to his right, Officer Henry decided that before they proceeded he wanted to confirm that Defendant was unarmed.  This request was based on Defendant's extended criminal history, as well as with his association with recent events at the house on Fern.  Officer Henry was familiar with that history from his research in preparing for the April 2022 search warrant.  Officer Henry testified on direct examination that Defendant's criminal history included a conviction for aggravated battery and possession of a firearm by a convicted felon.

During cross-examination, counsel for Defendant obtained agreement from Officer Henry with the suggestion that James had been convicted in 2007 and released from prison in 2016.

However, it does not appear that Officer Henry's information was unreasonably stale.  It was also revealed that Officer Henry (1) had personally executed a search warrant, in 2020, for another house of Defendant and his son in Wichita (at 1657 North Spruce) in which nine firearms were recovered, (2) knew of another traffic stop of Defendant which led to his arrest for firearm possession, and (3) was aware of the execution of a search warrant for suspected prostitution at a house associated with Defendant in Southwest Wichita in which several firearms were recovered.

In addition, as noted earlier, Officer Henry was involved in the execution of the search warrant for the house at 1026 S. Fern only a few weeks before the traffic stop here in issue. Defendant was present at the time the warrant was executed, and the search recovered a firearm and drug paraphernalia.  And in the time after the execution of that warrant, Henry had learned from a citizen's report that the suspicious criminal activity continued in or near the house on Fern.

Officer Henry patted Defendant down, and felt what appeared to be a handgun.  Officer Hornberger, moving around behind the Audi, also saw what appeared to be the butt of a handgun in Defendant's pocket.

Defendant was then handcuffed and placed under arrest, and the officers removed a Glock 19, 9 mm pistol from his possession.

At the hearing, the Court reviewed the footage of the shoulder video cameras carried by both officers.  The video begins as the officers are driving north on Seneca, and continues through the time of  Defendant's arrest.  Both videos show the officers' view of the rear of the Audi after the stop as they walk past it to take up positions to interact with the driver.  Both videos show the tag, viewed at a distance of a few feet, to be illegible.

Defense counsel notes that the video shows that as the officers pulled off the expressway, Officer Hornberger radioed to dispatch, "60-day tag on a black Audi.  I can't read it until I'm up on it," and suggests this means that the tag was legible while the officers were still in their vehicle.

However, Officer Hornberger further testified that under normal procedure he would radio the license plate number along with the location of the stop, but could not do so while he was still in the patrol car.  His statement to dispatch was not an indication that he could then read the tag, but was intended to convey the idea that,  "I can't read it until I get out and I'm a lot closer than this."  The Court finds Hornberger's testimony credible under the circumstances of the case.

Finally, the government also presented photographs of the Audi's license plate.  Those photographs, the video, and the officers' credible testimony establish that the Audi had a valid

temporary permit, but that it was hidden behind a plastic cover which was nearly opaque, with the result that it was not visible from more than five feet.

## II.     Legal Standard

A traffic stop is a seizure under the Fourth Amendment and must be objectively reasonable to pass constitutional muster.[1]  That is, the stope must be justified by reasonable articulable suspicion under the standards set forth in *Terry v. Ohio*.[2]  In order to be reasonable, a traffic stop must be "justified at its inception."[3]  "[A] traffic stop is valid [at its inception] if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."[4]

During the stop, the officer's actions must be " 'reasonably related in scope to the circumstances which justified the interference in the first place.' "[5]  "An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation."[6]  In conducting the stop, the officer may order the driver and passengers out

---

[1] *Delaware v. Prouse*, 440 U.S. 648, 653-54 (1979); *see also United States v. Ozbirn*, 189 F.3d 1194, 1197 (10th Cir. 1999).

[2] 392 U.S. 1 (1968). *See United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998)

[3] *United States v. Williams*, 271 F.3d 1262, 1266 (10th Cir. 2001) (quotations omitted).

[4] *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc).

[5] *Id*. at 786 (quoting *Terry*, 392 U.S. at 20).

[6] *United States v. Guzman*, 864 F.2d 1512, 1519 (10th Cir. 1988) (citations omitted).

of the vehicle,[7] and may pat-down the driver and passengers if he has a "reasonable suspicion that they may be armed and dangerous."[8]

While the suspicion required for such a pat down "cannot be based on a 'mere hunch,' it also 'need not rise to the level required for probable cause, and falls considerably short of satisfying a preponderance of the evidence standard.' "[9]   The pat down is allowed "not to discover evidence of a crime, 'but to allow the officer to pursue his investigation without fear of violence.' "[10]   The court's assessment of the reasonableness of the officer's suspicion "is based on the totality of the circumstances, taking into account an officer's reasonable inferences based on training, experience, and common sense."[11]   The Tenth Circuit has recognized that a pat down may be justified "[e]ven when an officer ha[s] limited 'specific information leading him to believe that [an individual] was armed or dangerous' and no knowledge of the individual's having possessed a weapon."[12]   An extensive criminal history of violent crime may support a

---

[7] *Arizona v. Johnson*, 555 U.S. 323, 331 (2009).

[8] *Id*. at 332 (quoting *Knowles v. Iowa*, 525 U.S. 113, 117-18 (1998)).

[9] *United States v. Davis*, 636 F.3d 1281, 1291 (10th Cir. 2011) (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)).

[10] *United States v. Manjarrez*, 348 F.3d 881, 886–87 (10th Cir. 2003) (quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972)).

[11] *United States v. Rice*, 483 F.3d 1079, 1083 (10th Cir. 2007) (citing *Avizu*, 534 U.S. at 274).

[12] *United States v. Garcia*, 751 F.3d 1139, 1142 (10th Cir. 2014) (quoting *United States v. McRae*, 81 F.3d 1528, 1536 (10th Cir. 1996)).

limited pat down of a driver during a traffic stop for officer safety,[13] as will "an individual's known connection with drug transactions."[14]

The Court notes that although Defendant carefully explored the extent of Officer Henry's knowledge of his prior history during the hearing, he makes no argument that the Officer violated his rights by performing a pat down during the traffic stop.  In both his motion and at the hearing, Defendant's argument is limited to the claim that the traffic stop itself was unlawful in light of prior Tenth Circuit precedent.

### III.    Analysis

Kansas law requires that "[e]very license plate shall at all times be securely fastened to the vehicle . . . in a place and position to be clearly visible, and shall be maintained free from foreign materials and in a condition to be clearly legible."  K.S.A. § 8-133(c).

Defendant argues the officers could not detain him or his vehicle once they were able to physically see the temporary license permit, even though they were required to walk to within a few feet to do so.  This result, Defendant urges, follows from two decisions of the Tenth Circuit, *United States v. McSwain*[15] and *United States v. Edgerton*,[16] involving vehicle stops at different locations along Interstate 70.  The Court concludes that Defendant both overstates the effect of *McSwain* and *Edgerton*, and wholly fails to take account of subsequent decisions which have recognized the limits of those decisions.

---

[13] *See Rice*, 483 F.3d at 1083, 1084-85 ("during traffic stops, we have consistently recognized that the risk to officer safety is heightened by the confrontational nature of the encounter").

[14] *United States v. Garcia*, 459 F.3d 1059, 1064 (10th Cir. 2006).  *See also United States v. Albert*, 579 F.3d 1188, 1195 (10th Cir. 2009).

[15] 29 F.3d 558 (10th Cir. 1994).

[16] 438 F.3d 1043 (10th Cir. 2006).

In *McSwain*, a Utah Highway Patrol trooper stopped the defendant's vehicle travelling along Interstate 70 in Sevier County, Utah, because he could not read the temporary registration sticker in the rear window "because it appeared to be covered with reflective tape."[17]  As he approached the vehicle on foot after the stop, the officer was able to see that "the temporary registration sticker was from Colorado and that the reflective tape merely was a new device used by the State of Colorado to prevent alteration of the sticker's expiration date [and] that the sticker was valid and had not expired."[18]  Even though the officer knew the tag was properly displayed, he proceeded to ask the driver a series of questions, including asking for his license and registration.

The Tenth Circuit found that, as the officer stopped the vehicle for "the sole purpose of ensuring the validity of the vehicle's temporary registration sticker," questioning the driver was unjustified "[o]nce [he] observed that the temporary sticker was valid and had not expired."[19]

In *Edgerton*, a Kansas Highway Patrol trooper stopped the defendant's Mercedes-Benz sedan travelling on 1-70 at night.  The trooper stated that he stopped the vehicle because he was unable to determine if the vehicle had a temporary tag, testifying he could not read the state of origin or the numbers of the tag from a distance of "four to five car lengths."[20]  But, as he approached on the vehicle on foot after the stop, he could see the registration and that it appeared

---

[17] 29 F.3d at 560.

[18] *Id.*

[19] *Id.* at 561.

[20] 438 F.3d at 1045.

to be valid.  While the vehicle did not have a license plate in its rear bracket, it displayed a plate-sized temporary registration tag in the rear window.

The Tenth Circuit held that the initial stop of the vehicle was valid, but that the trooper's right to detain the vehicle ended as soon as he could see the valid permit.  As the court stressed, "the *only* reason the registration tag's 'manner of display' was purportedly unlawful in this case was because 'it was dark out' and [the trooper] could not see or read it.  Simply put, the tag was illegible not due to any material within Defendant's ability to control, but due to external conditions."[21]  The court found that "an otherwise unremarkable temporary registration tag" is not rendered unlawful merely because there are "less than optimal viewing conditions."[22]

> We decline to require optimal viewing conditions before compliance with a statute requiring an otherwise unremarkable license plate to be "clearly visible" is assured.  Fourth Amendment reasonableness does not depend on external conditions, but on a reasonable suspicion that a driver has violated the law.  The notion that an unobscured, wholly unremarkable Colorado temporary registration tag posted in the rear window of Defendant's vehicle consistent with Colorado law was not "clearly legible" within the meaning of Kan. Stat. Ann. § 8-133 because "it was dark out" proves too much for us.  Every temporary tag is more difficult to read in the dark when a car is traveling 70 mph on the interstate.  But that does not make every vehicle displaying such a tag fair game for an extended Fourth Amendment seizure.

Once the trooper could see the tag was "unremarkable," the court concluded any reasonable suspicion that the driver was violating K.S.A. 8-133 "dissipated."[23]

Defendant's argument—that under *Edgerton* K.S.A. § 8-133 cannot be violated so long as the officer is able to see a license plate or temporary permit is valid by to within a few feet of

---

[21] *Id.* at 1050 (emphasis in original, citation omitted).

[22] *Id.*

[23] *Id.* at 1051.

the vehicle—misreads the statute and the careful qualifications attached to *Edgerton*. The temporary tag in that case was both "unremarkable" and any lack of visibility was due to "external conditions," meaning events "not . . . within Defendant's ability to control," such as "snow, rain fog, [or] glare."[24]   The *Edgerton* court specifically contrasted the facts presented in that case with both an earlier Colorado decision involving a similar statute on the grounds that in that case "the rear of the vehicle was covered with dirt obstructing the rear license plate,"[25] as well as its own decision in *United States v. DeGasso*,[26] from two years before.

DeGasso had upheld the stop of a truck with a tag mounted in a way to block the lettering on the bottom of the tag, such that the trooper was able to read the lettering only after he stopped the truck and left his own patrol car.   The *DeGasso* court had found *McSwain* "easily distinguishable" because it did not involve any claim of an obscured license plate:

> In *McSwain*, the traffic stop was made in order to determine whether a temporary registration sticker was valid; there was no requirement that it be visible or unobscured. In that case, when the officer approached the vehicle and found that the sticker was valid, the purpose for the stop was over.  In this case, the violation was that the lettering on the license plate was not "clearly visible," *which remained true even after the trooper approached the truck and was able, at that point, to read it*.[27]

The *DeGasso* court concluded that the trooper "was justified in making the traffic stop," because "plate was obscured by the bumper and not 'clearly visible' *from the highway*."[28]

---

[24] *Id*. at 1050.

[25] *Id*. (citing *People v. Altman*, 938 P.2d 142, 143 (Colo. 1997)).

[26] 369 F.3d 1139 (10th Cir. 2004).

[27] *Id*. at 1149 (emphasis added).

[28] *Id*.

- 11 -

As a result, nothing in *McSwain*, *Edgerton*, or *DeGasso* warrants the holding that the "clearly visible" requirement of K.S.A. § 8-133 may be satisfied by an arm's length view. And any such argument stands in conflict with both the purpose of the statute and subsequent decisions.

The purpose of the statute was explained by the Kansas Court of Appeals in *State v. Hayes*,[29] in an opinion addressing the question of whether the law applied to vehicles registered both outside and inside the state. The defendant's vehicle in that case was stopped because the license plate bracket blocked the state designation (Indiana). The Kansas Court of Appeals reversed the trial court's decision to suppress the results of the stop, observing that "[w]hile [Section 8-133] does not specifically state that the state name must be visible when a license plate is displayed, it does state that the tag must be 'legible.' We read this to mean that *all* of the tag must be legible, including the state name, which may be the most important information on the tag."[30]

In the course of the opinion the court also addressed the reason for the statute:

The purpose of requiring display of a tag in the first place, and legibility of tag displayed, is demonstrated by the very occurrence here. The obscured tag frustrated the officers in a routine license plate check. Law enforcement officials frequently must determine from tag numbers whether a vehicle is stolen; whether it is properly registered; or whether its occupant is suspected of a crime, is the subject of a warrant, or is thought to be armed.[31]

---

[29] *State v. Hayes*, 8 Kan. App. 2d 531, 660 P.2d 1387, 1389 (1983).

[30] *Id.* at 1389 (emphasis in *Hayes*). The court also held that the visibility of the logo "The Hoosier State" was insufficient to "excuse the obscured 'Indiana.' " *Id.* "We think it asks too much of the average citizen, police officer or not, to hold him strictly accountable for knowing that the Hoosier state is Indiana. Many may know this, or other state nicknames, but some will not. Officer Duer testified he did not. On this issue we think the covering of the state name on a vehicle's license tag renders the tag illegible within the prohibition of K.S.A. 8-133, despite the fact that the state's nickname is legible." *Id.* at 1389-90.

[31] *Id. See also DeGasso*, 369 F.3d at 1148 (quoting this passage from *Hayes*).

Obscured tags thus frustrate a basic purpose of the statute.  And it was this purpose which led Judge Crow to interpret the statute to conclude that the law is violated "if the tag was not clearly legible to a law enforcement officer following a safe distance behind the vehicle," because "[o]fficers should not be required to stop vehicles in order to read their tags."[32]

This interpretation was expressly adopted by the Kansas Court of Appeals in *State v. Moss*.[33]  There, the Kansas Court of Appeals expressly agreed with the view originally expressed by Judge Crow, holding that " '[c]learly legible,' as that term is used in K.S.A. 2019 Supp. 8-133, means visible to a law enforcement officer following at a safe distance."[34]  Thus, the fact that the officer who conducted the stop "could read [the] temporary tag when he came within 5 feet of the vehicle does not negate the traffic violation because the tag remained illegible [at a safe driving distance] and in violation of K.S.A. 2019 Supp. 8-133."[35]

Subsequent federal decisions are consistent with this conclusion.  In *United States v. Ledesma*,[36] decided three months after *Edgerton*, the Tenth Circuit upheld the brief detention of a driver following a stop for potentially violating K.S.A. § 8-133.  In that case, the driver's temporary registration had been placed behind tinted windows, "so dark, in fact, that Trooper Ranieri could hardly make out the numbers on the temporary registration, even as he approached on foot from a distance of four or five feet.  Specifically, he could not read the name of the state

---

[32] *United States v. Granados-Orozco*, 2003 WL 22213129, at *2 (D. Kan. 2003); *United States v. Rubio-Sanchez*, 2006 WL 297724, at * 4 (D. Kan. 2006).

[33] 2020 WL 7086182 (Kan. Ct. App. 2020).

[34] *Id*. at *4 (citing *United States v. Orduna-Martiez*, 561 F.3d 1134, 1139 (10th Cir. 2009)).

[35] *Id*. at *6.

[36] 447 F.3d 1307 (10th Cir. 2006).

- 13 -

that issued the tag, and he could not determine whether the numbers represented an expiration date."[37]

Thus, because the tinted glass made the tag "almost entirely illegible," the trooper was presented with "a straightforward violation of § 8-133."[38]  Nor did it matter, the court held, that the tag may have been properly displayed under the law of the state where it had been issued:

> That she appears to have complied with Michigan law by following the printed instructions on the sticker does not render the detention unreasonable, both because state troopers cannot be expected to possess encyclopedic knowledge of the traffic regulations of other states, and because Kansas courts have held that "the display of an illegible or obscured vehicle tag is a violation of K.S.A. 8-133 even if the vehicle is duly licensed in another state."[39]

The following year, the Tenth Circuit addressed another stop under the Kansas statute in *United States v. Lyons*.[40]   In that case, the Kansas Highway Patrol trooper patrolling I-70 noticed that a Chevy Trailblazer which was otherwise dirty and salty had a clean spare tire attached to its undercarriage.  Suspecting the tire might contain contraband, he began to follow the vehicle to check its license plate, but it was too dirty to read.  The trooper pulled the vehicle over for violating K.S.A. § 8-133.

After stopping the vehicle, the trooper "walked up to it from behind and wiped away the dirt covering the expiration tag and the name of the issuing state (Virginia) with his fingers."[41] The Tenth Circuit concluded that the trooper's inability to read the tag as he was following it in

---

[37] *Id*. at 1313 (record citation omitted).

[38] *Id*.

[39] *Id*. (quoting *Hayes*, 660 P.2d at 1389).

[40] 510 F.3d 1225 (10th Cir. 2005).

[41] *Id*. at 1231.

his patrol car represented a violation of the statute. And "because there was a violation of Kan. Stat. Ann. § 8–133, Ranieri could temporarily detain Lyons, while requesting his driver's license and vehicle registration, running a criminal history check and issuing him a warning ticket."[42] Nor did it matter that the trooper could read the tag once he physically wiped away the dirt on the tag. As to its earlier decisions, the court explained:

> The officers in *McSwain* and *Edgerton* were justified in stopping the defendant's vehicle based on a reasonable suspicion that a traffic violation was occurring but that suspicion evaporated once they observed no violation had occurred. Once their suspicion evaporated, the officers had no reason to continue to detain the vehicle or its occupants and therefore their subsequent actions (requesting the drivers' documents, running a criminal history check, inquiring about travel plans and seeking consent to search) were unlawful. This case stands in sharp contrast. Ranieri's suspicion for stopping Lyons' vehicle (illegible expiration tag) did not evaporate, but rather was confirmed, once he stopped Lyons' vehicle. Therefore, Ranieri's detention of Lyons while performing a license and vehicle registration check and issuing a warning ticket did not violate the Fourth Amendment.[43]

Since *Ledesma* and *Lyons*, courts have contrasted a "straightforward violation" of the license plate statute, such as that noted in *Ledesma*, with the "wholly unremarkable" display in *Edgerton*. Thus, in *United States v. Orduna-Martinez*,[44] Judge Crow observed that "*Edgerton* analysis is inappropriate," as the statute is violated when a license plate bracket even "partially obscure[s]" the name of the state which issued the license plate.[45] In affirming the district court's denial of defendant's suppression motion, the Tenth Circuit concluded its opinion by observing that "[t]he cases we have utilized make it clear that relatively slight obstructions of the

---

[42] *Id.* at 1235.

[43] *Id.* at 1236.

[44] 491 F. Supp. 2d 1021, 1027 (D. Kan. 2007), *aff'd*, 561 F.3d 1134 (10th Cir. 2009).

[45] *Id.* at 1027.

registration decal can give rise to a proper traffic stop.  Indeed in a state like Kansas, where its partisans are justifiably proud of their athletic teams, prevalent home-team brackets may result in a stop."[46]

Similarly, in *United States v. Bastidas-Figueroa*,[47] the stop was deemed justified under § 8-133 where the defendant's temporary tag was behind a plastic shield which was "cover[ed]" by "dirt" and "obstructed by debris," such that "[e]ven after stopping the vehicle and approaching it on foot, Trooper Epperly was only able to tell from about one to two feet away that the tag was a temporary Arizona tag."[48]

The Court finds that Officer Henry had a reasonable suspicion for stopping Defendant's vehicle for violating K.S.A. 8-133, and that the Defendant's rights were not violated during the encounter.  The officer had a reasonable suspicion that the vehicle's temporary permit was not in compliance with state law because it was not visible at a safe driving distance, and this suspicion justified the stop.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress (Doc. 16) is hereby **DENIED**.

**IT IS SO ORDERED**.

Dated this 14th day of August, 2023.

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE

---

[46] 561 F.3d at 1140.

[47] 2007 WL 2317134 (D. Kan. 2007).

[48] *Id*. at 3.